# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Meghan Christina Johnson,

        Plaintiff,

v.

Officer Stephane Courtois,
in his official and individual
capacities as a police officer
for the City of Minneapolis; and
the City of Minneapolis,

        Defendants.

File No. 17-cv-3608 (ECT/DTS)

**MEMORANDUM OPINION
AND ORDER**

---

Paul Applebaum, Applebaum Law Firm, St. Paul, MN, for plaintiff.

Gregory P. Sautter, Office of the City Attorney, Minneapolis, MN, for defendants.

---

Plaintiff Meghan Christina Johnson ("Johnson") commenced this action under 42 U.S.C. § 1983 seeking to recover damages stemming from what she alleges were an unconstitutional arrest and use of force perpetrated upon her by Minneapolis Police Officer Stephane Courtois ("Courtois"). From start to finish, the material events giving rise to Johnson's claims occurred outside a Minneapolis bar and within about a forty-minute window in the early morning of May 18, 2014. Several undisputed facts provide a very general summary of what happened. While waiting outside to enter the bar, Johnson observed Courtois's partner, Officer Efrem Hamilton ("Hamilton"), arresting one of her friends. Johnson approached Hamilton and asked why her friend was being arrested. After a time (during which the parties dispute precisely what happened), Courtois shoved

Johnson. Johnson responded to the shove with a two-sentence statement. The second sentence was two words long and began with a profanity. Very quickly after Johnson completed her statement, Courtois arrested Johnson, and he used physical force to complete the arrest. Johnson was charged with obstructing legal process under Minn. Stat. § 609.50.

Courtois seeks summary judgment based on qualified immunity, and he asserts essentially two grounds to support this outcome. First, Courtois argues that Johnson admitted a dispositive fact by serving untimely answers to requests for admission and then failing to seek a court order permitting withdrawal of her admissions. Second, Courtois argues that, even if Johnson is permitted to withdraw her admissions, the undisputed facts still establish the reasonableness of his actions as a matter of law. As to the first argument, Eighth Circuit law tilts in favor of construing some of Johnson's filings as a motion to withdraw her admissions, and then granting that motion. As to the second argument, the evidence viewed in a light most favorable to Johnson would permit a reasonable fact-finder to conclude that Courtois's arrest and use of force were not objectively reasonable, precluding summary judgment in his favor on the basis of qualified immunity.

I

Courtois and Hamilton, both Minneapolis police officers, were working the bar beat shortly after midnight on May 18, 2014. Sautter Decl. Ex. 2 ("Hamilton Dep.") at 9 [ECF No. 20-2]. They were in uniform working for Bar Louie in the Uptown neighborhood of Minneapolis, where at least part of their duties entailed monitoring patrons as they waited in line to enter the bar. *See id.* at 10, 16. Johnson was also outside Bar Louie that night, waiting in line with three companions, when she ran into an old friend whose first name is

Duncan.[1]  Sautter Decl. Ex. 1 ("Johnson Dep.") at 33–34, 36, 38 [ECF No. 20-1].  Johnson

and Duncan chatted briefly before Hamilton and Courtois approached.  *Id.* at 36, 38.

At the time, Johnson was unaware of the reason the officers approached.  *See id.*

at 33.  Apparently, shortly before Johnson arrived at Bar Louie, Hamilton had observed

Duncan in line, pouring a substance Hamilton suspected was alcohol from a flask into a

cup.  Hamilton Dep. at 11.  When Duncan saw Hamilton watching him, he set the cup down

on a nearby bench and returned to the line.  *Id.* at 12–13.  Hamilton said something to get

Duncan's attention, but Duncan ignored him.  *Id.* at 13–14.  At some point, Duncan sneaked

back to the bench, took another drink, and again returned to the line.  *Id.* at 14.  Hamilton

again tried to get Duncan's attention, this time shining his flashlight on the back of

Duncan's head and calling out to him.  *Id.* at 15.  Eventually the two spoke, with Duncan

saying everyone was doing it ("it" apparently meaning surreptitiously drinking while in

line) and Hamilton telling Duncan to leave.  *Id.* at 16.  Duncan pretended he was leaving,

but instead walked only to the end of the line.  *Id.* at 16–18.  Hamilton told him to come

back, at which point Duncan walked away, toward the parking lot, "a little bit" intoxicated.

*Id.* at 16, 19.  Hamilton followed, and placed Duncan under arrest.  *Id.* at 19.  Duncan put

his hands behind his back, and Hamilton grabbed them.  *Id.*

At that point, Johnson walked toward Hamilton and Duncan, with Courtois

following behind Johnson.  *Id.* at 18; Sautter Decl. Ex. 3 ("Courtois Dep.") at 19 [ECF

No. 20-3].  From there, participant and witness accounts diverge.  Hamilton testified that

---

[1]     Duncan is not a party to this case, and in the interest of his privacy, he will be
referred to by his first name only.

Johnson somehow—and he is not exactly sure how—disconnected his hands from his grasp on Duncan, whom he had not yet handcuffed. Hamilton Dep. at 19–21. Hamilton says he told Johnson she needed to leave and that she could be arrested for obstruction, but that she continued standing where she was and telling Hamilton to wait. *Id.* at 21; Courtois Dep. at 20. Hamilton proceeded to escort Duncan to the squad car and to handcuff him. Hamilton Dep. at 22. Courtois observed that at this point Johnson was "[w]ithin a few feet" of Hamilton, Duncan, and himself, though he could not specify whether that meant a distance of one foot or somewhere short of six feet. Courtois Dep. at 22–23. Hamilton placed Duncan in the back of the squad car. Hamilton Dep. at 22. Because his attention was focused on Duncan, Hamilton did not see or hear anything more concerning Johnson or her interactions with Courtois until Johnson herself was being placed in the squad car following her own arrest a short time later. *Id.* at 23.

Johnson denies she ever touched Hamilton. Johnson Dep. at 44–45. She testified that, as she watched his interaction with Duncan from her spot in line, she was concerned about why officers were arresting her friend because, based on what she knew at the time, "it seemed like it was completely out of the blue." *Id.* at 33. She says by the time she reached Hamilton, he was already putting Duncan in handcuffs. *Id.* at 44. She asked Hamilton, "Why are you arresting my friend?" and when Hamilton ignored her, she repeated her question. *Id.* at 44–45. Johnson's deposition testimony reflects that it is at this point her encounter with Courtois began:

Q:      Did he [Courtois] tell you anything?

A:      It's on the video.  I don't remember verbatim what he said.

Q:      What do you remember?

A:      I remember him saying something on the lines of, "Do you want to be next," and then approaching me in a violent manner and shoving me.

Q:      Did he tell you to walk away and leave them alone?

A:      No.

Q:      Did he tell you to leave?

A:      He might have said something along those lines.  And I think I may have said something like, "I have every right to stand right here," because I was nowhere near him, he started approaching me.  And I was like, "Why are you approaching me?  I have every right to stand right here."   So he was basically intimidating me to move for no apparent reason.

Q:      Where was he and where was [Duncan] when he told you all this?

A:      Well, I didn't know at the time, but he was handcuffed and he was on the police car.  I didn't know that until after I had been arrested though.

Q:      The officer who pushed you, was he between you and the other officer and [Duncan] --

A:      No.

Q       -- or was he somewhere else?

A:      No.  I had already started backing away from the situation, and he's the one who started aggressing me and pursuing me to the extent where he decided to come up and shove me.

Q:      So [Duncan] was not --

A:      No, he was not --

Q:      -- behind him?

A:      -- in my eyesight.  He was not in the area in which this
        occurred.

Q:      How far away was he?

A:      I don't know, because I didn't know at the time where
        he was.  He wasn't in our vicinity.  All I know was the
        police officer was aggressively coming towards me.

Johnson Dep. at 49–50.  Johnson testified that, after "aggressively coming towards" her,

Courtois shoved her.  *Id.* at 49–50.  Johnson's sister, who was nearby watching, observed

that—at least until Courtois approached and shoved her—Johnson was not angry or

yelling; rather, she spoke "calm[ly] but urgent[ly]."  Sautter Decl. Ex. 4 ("E. Johnson

Dep.") at 36 [ECF No. 20-4].

        Courtois testified that, at somewhere around this time, Johnson was yelling, and he

told her to leave and back away.  Courtois Dep. at 23.  He stated in his deposition, "I put

my hands in front of me for her to not keep approaching because she was coming toward

us.  Then I pushed her, she still, she was still yelling."  *Id.*  According to Courtois, this is

the only time he touched Johnson until he ultimately arrested her.  *Id.* at 24–25.

        Courtois's testimony appears to be inconsistent with a brief video of his encounter

with Johnson that Johnson's sister recorded on her cell phone.  *See* Sautter Decl. Ex. 10

[ECF No. 20-10].  In that video, Courtois appears to approach Johnson, not the other way

around.  *Id.*  As he walks toward her, the front of his torso close to hers, she takes several

steps backwards.  *Id.*  She is not yelling.  *Id.*  He shoves her chest—Johnson says he shoved

her breast, and Courtois insists it was her shoulder, but the video seems ambiguous—and she staggers backward. *Id.* The video shows that after Courtois shoves Johnson, he turns and begins to walk away. When he is several steps from Johnson, she yells after him, "You just pushed a woman! Fuck you!" He wheels around, takes four strides back to her, grabs her, and walks her back toward the squad car. *Id.* Johnson says somewhere in the course of this arrest, Courtois stepped on her foot, bruising it, and that her shoulders were sore for a few days after he pushed her. Johnson Dep. at 28 (testifying that she cannot remember if he stepped on her foot before she was handcuffed).

Courtois arrested Johnson. Courtois Dep. at 24. Courtois's decision to arrest Johnson was based on her failure to obey an order to leave, not based on any physical resistance she offered to him or to Hamilton. *See id.* at 27–28. The parties agree that no evidence in the record shows that Hamilton told Courtois that Johnson had touched him as he handcuffed Duncan, or that Courtois had seen Johnson touch Hamilton. Def. Ltr. Br. at 1 [ECF No. 28]; Johnson Ltr. Br. at 1 [ECF No. 27]. And Courtois testified that he, and he alone, made the decision to arrest Johnson, without first consulting with Hamilton. Courtois Dep. at 37–38. Johnson was transported to jail, where she was held for several hours before being released. Sautter Decl. Ex. 8 at 1 (showing Johnson posted bail at 04:35), 3 (documenting arrest time of 00:40) [ECF No. 20–8]. She was charged with obstruction and agreed to a suspended prosecution. *See* Johnson Dep. at 28, 30–31. This suit followed.

Before getting to the merits of Courtois's motion, some housekeeping is necessary to address issues resulting from Johnson's pleadings. Johnson commenced this action originally in Hennepin County District Court against Hamilton, not Courtois. ECF No. 1-1. Defendants removed. ECF No. 1. Following removal, Johnson sought, and was granted, leave to file an amended complaint naming Courtois, not Hamilton, and both Johnson's amended complaint and her briefing on this motion confirm her dismissal of Hamilton. ECF Nos. 8 (motion), 10 (order granting motion), 15 (amended complaint), and 22 (order granting Johnson leave to file her amended complaint after original deadline).

In her now-operative amended complaint—in addition to her § 1983 claims against Courtois that are the subject of this motion—Johnson asserts § 1983 claims against the City of Minneapolis and state tort claims for battery and false imprisonment against both Courtois and the City. In her briefing and at the hearing on this motion, Johnson made clear that she agreed to the dismissal of her § 1983 claims against the City and "her state tort claims in their entirety." *See* Pl.'s Mem. in Opp'n at 3 [ECF No. 23]. Based on Johnson's concessions, Counts 1 and 2 of her amended complaint (her § 1983 claims) will be dismissed insofar as they assert claims against the City, and Counts 3 and 4 (her state tort claims) will be dismissed in their entirety.

Finally, although Johnson alleges § 1983 claims for violations of her "Fourth and Fourteenth Amendment[ rights under] the Constitution of the United States as well as the Minnesota Constitution," Am. Compl. ¶¶ 15, 17, the parties have briefed those claims exclusively under the U.S. Constitution. This makes sense. "It is well settled . . . that

§ 1983 may be an avenue for relief only when a plaintiff asserts that violations of *federal* rights have occurred." *Wax 'n Works v. City of St. Paul*, 213 F.3d 1016, 1019 (8th Cir. 2000). Furthermore, "there is no private cause of action for violations of the Minnesota Constitution." *Guite v. White*, 976 F. Supp. 866, 871 (D. Minn. 1997), *aff'd on other grounds*, 147 F.3d 747 (8th Cir. 1998); *see also Mlnarik v. City of Minnetrista*, No. A09-910, 2010 WL 346402, at *1 (Minn. App. Feb. 2, 2010) (explaining that "no private cause of action for a violation of the Minnesota constitution has yet been recognized" and that a constitutional claim alleged thereunder was not cognizable (internal quotation marks omitted)). Therefore, to the extent Johnson's § 1983 claims are premised on violations of the Minnesota Constitution, or to the extent Johnson intends to assert claims directly under the Minnesota Constitution, those claims will be dismissed.

III

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution "might affect the outcome of the suit" under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id.* at 255; *Tolan v. Cotton*, 572 U.S. 650, 651 (2014).

Courtois contends Johnson admitted a dispositive fact—that she touched Hamilton prior to her arrest—once and for all when she failed to serve timely responses to Defendants' requests for admission under Rule 36. On January 19, 2018, Defendants served four requests on Johnson. Sautter Decl. Ex. 6 at 1 [ECF No. 20-6]. As Courtois conceded at the hearing, Johnson's amended complaint rendered two of those requests irrelevant for purposes of this motion because they sought admission that *Hamilton* did not engage in certain conduct that, in the amended complaint, Johnson alleges was actually undertaken by *Courtois*. *Compare* Sautter Decl. Ex. 6 at 2, RFA Nos. 2–3 (regarding arrest and pushing by Hamilton), *with* Am. Compl. ¶¶ 12–13 (alleging arrest and pushing by Courtois). At the hearing on this motion, Courtois further conceded that another request for admission, concerning whether Johnson had consumed any quantity of alcohol within a two-hour period prior to the events outside Bar Louie, was not relevant to the disposition of this motion. As a result, the only request now relevant to Courtois's summary-judgment motion reads as follows:

> Admit that on or about May 18, 2014, you touched Officer Efrem Hamilton one or more times prior to your arrest.

Sautter Decl. Ex. 6 at 3, RFA No. 3. Because Johnson did not serve responses by February 21, 2018, *see id.* at 2 (seeking response within 30 days of service), Fed. R. Civ. P. 36(a)(3) (providing default of 30 days to respond), Fed. R. Civ. P. 6(d) (providing three additional days to respond to certain documents served by mail), each of the four requests

for admission was deemed admitted under Fed. R. Civ. P. 36(a)(3). Johnson served untimely responses denying each request on April 27, 2018. Sautter Decl. Ex. 6 at 6–7.

The parties dispute whether the Court must, or perhaps whether it should, treat the one request that is relevant to this motion (that Johnson touched Hamilton prior to her arrest) as admitted. Rule 36(a)(3) provides that "[a] matter is deemed admitted unless . . . the party to whom the request is directed" timely serves a signed, written answer or objection on the requesting party "within 30 days after being served," though a "shorter or longer time for responding may be stipulated to under Rule 29 or be ordered by the court." Courtois's opening brief relies exclusively on this provision of the rule to support his contention that the lack of a timely answer or objection by Johnson automatically and, at least in this case, irretrievably operates as an admission that Johnson touched Hamilton prior to her arrest.

The Eighth Circuit has rejected the application of the rule advocated by Courtois, instead holding that that "the failure to respond in a timely fashion does not require the court automatically to deem all matters admitted." *Gutting v. Falstaff Brewing Corp.*, 710 F.2d 1309, 1312 (8th Cir. 1983). Because the rule explicitly provides that courts may allow a longer time to respond, *see* Fed. R. Civ. P. 36(a)(3), a court possesses discretion to permit responses that otherwise would be untimely. *Gutting*, 710 F.2d at 1312 (collecting cases).

Under *Gutting*, a party's service of a late response under Rule 36 may function as a withdrawal of—or at least, an attempt to withdraw—its admissions. *See id.* at 1313. And courts may permit withdrawal or amendment under Rule 36 when doing so promotes the

11

presentation of the merits of the action and when the party who obtained the admissions "fails to satisfy the court that withdrawal or amendment will prejudice him in maintaining his action or defense of the merits." *Id.* (citation and internal quotation marks omitted); *see also* Fed. R. Civ. P. 36(b) (test for amending or withdrawing admission). Failure to consider both factors in determining whether to permit withdrawal or amendment constitutes error on appeal. *See Gutting*, 710 F.2d at 1313.

Rule 36(b) says that a court may permit admissions to be withdrawn or amended, but only "on motion." Therefore, before addressing whether to permit withdrawal of admissions, a federal district court must satisfy itself that the party seeking withdrawal has done enough to meet the "on motion" requirement of Rule 36(b). In his reply, Courtois argues that under the more recent Eighth Circuit precedent of *Quasius v. Schwan Food Co.*, 596 F.3d 947 (8th Cir. 2010), Johnson must have done something more to meet the "on motion" requirement than merely serving late responses. Defs. Reply Mem. at 4–5 [ECF No. 25]. Courtois is correct that, as *Quasius* observed, once a party has failed to timely respond and requests for admission are admitted, "[a]t that point, the proper procedure for [the party to whom the requests were directed] to withdraw or amend the admissions [is] to file a motion with the court pursuant to Rule 36(b)." *Quasius*, 596 F.3d at 951 (citation and internal quotation marks omitted). At the same time, however, *Quasius* reaffirmed prior Eighth Circuit cases and other precedent interpreting the "on motion" requirement of Rule 36(b) "to encompass court filings that [are] not formal motions." *Quasius*, 596 F.3d at 951. Also, though the court in *Quasius* there determined that the responding party "made

no filing with the district court that might be construed as a motion to withdraw or amend under Rule 36(b)," the facts here are distinguishable from *Quasius*. *Id.* at 952.

*Quasius* acknowledged that, although under Rule 36(b), admissions may be withdrawn "on motion," prior Eighth Circuit decisions "have interpreted that phrase generously . . . to encompass court filings that were not formal motions." 596 F.3d at 951. For example, in *Warren v. International Brotherhood of Teamsters*, 544 F.2d 334 (8th Cir. 1976), the defendant filed untimely answers denying requests for admission with the court and had previously filed an answer and amended answer that denied the same factual allegations. *Id.* at 338–39. *Quasius* cited those filings in *Warren* as "the functional equivalent of a motion to withdraw admissions under Rule 36(b)." 596 F.3d at 951. And in *Bergemann v. United States*, 820 F.2d 1117 (10th Cir. 1987), the defendant never filed any answer at all to a request for admission on the dispositive fact question in a wrongful-death action, and never moved to withdraw its admission, but the Tenth Circuit affirmed the district court's decision to allow the defendant to contest the fact issue at trial. *Id.* at 1118, 1121. The Tenth Circuit explained that the defendant's response in opposition to the plaintiff's summary-judgment motion and its arguments at pretrial hearings that it should not be bound by its admissions, "were, in essence, motions to withdraw the admissions." *Id.* at 1121. *Quasius* cited *Bergemann* with approval. 596 F.3d at 952. Thus, *Quasius* does not constrain a district court's "authority to permit withdrawal or amendment of admissions under Rule 36(b) [where] the party who admitted matters later filed with the court a pleading that was sufficient to constitute a 'motion' under a liberal reading of the rule." *Id.*

Here, Johnson's filings are "sufficient to constitute a 'motion'" to withdraw her admission under *Quasius*. *Id.* Johnson's original complaint alleged that "Hamilton falsely claimed in his police report that Plaintiff . . . pushed his hands away from [Duncan] in order to interfere with Hamilton's attempts to arrest him" and that "[a]t no time did [Johnson] make contact with" Hamilton. Compl. ¶¶ 10–11 [ECF No. 1]. Johnson's amended complaint, filed after she served her late answers to the requests for admission, reaffirmed those specific denials. Am. Compl. ¶¶ 10–12. Johnson's brief in opposition to Courtois's summary-judgment motion again denied that she touched Hamilton. *E.g.*, Pl.'s Mem. in Opp'n at 4. Both Johnson and her sister made the same denials under oath at their depositions, and those depositions occurred after Johnson served her untimely answers to the requests for admission. Johnson Dep. at 44–45; E. Johnson Dep. at 36. Johnson's amended complaint, late-served answers, and deposition excerpts have been filed with the Court. Though it is true that Courtois filed some of those documents, including Johnson's late-served answers, that seems to be the expected consequence of Courtois, as the moving party, filing first, and Johnson, as the responding party, not duplicating Courtois's filings. Finally, Johnson argued at the hearing on this motion that her untimely denial should count, and at least some of the assertions made in support of that argument were effectively a request to withdraw the admission.

Courtois argues that *Quasius* resembles this case too closely to justify a different outcome here, but *Quasius* is distinguishable. There, the district court specifically asked at a hearing on the defendant's summary-judgment motion whether there were any motions pending with respect to the as-yet-unanswered requests for admission, and Quasius (the

plaintiff) said that there were not. *Quasius*, 596 F.3d at 950. Following the hearing, the district court initially "declined, however, to grant summary judgment based on Quasius's admissions. Instead, the court gave Quasius thirty days . . . to file a motion to amend or withdraw his admissions," but Quasius filed no motion. *Id.* What's more, Quasius filed no response to a post-hearing letter filed by the defendant repeating its request for summary judgment based on Quasius's admissions. *Id.* In short, Quasius's actions prior to the district court's entry of summary judgment appear to have given no indication to the court that Quasius sought to withdraw the admissions. Here, Johnson has taken a different approach. It is true that Johnson filed no formal motion seeking withdrawal of the admissions prior to the summary-judgment hearing. However, as described above, several filings and Johnson's arguments at the hearing all demonstrate a clear intent to seek withdrawal of the admissions and represent the "functional equivalent" of a motion to withdraw of the sort described and approved of in *Warren*, *Bergemann*, and *Quasius*.

Courtois also argues that the Eighth Circuit found it significant that *Quasius* did not *file* his late answers with the court, and only *served* them on the defendant, evidently suggesting that Johnson's failure to file her late answers herself (recall that Courtois filed them) means that she has failed to do something essential to effectively seeking withdrawal of the admissions. Defs. Reply Mem. at 5. Given that the late answers have been filed, it would seem unnecessary to separately require Johnson to file them again. Regardless, it seems more fair to say that the problem Quasius encountered on review was his failure to file *anything*—whether his late-served answers or any other paper—"that might be construed as a motion to withdraw or amend under Rule 36(b)." *Quasius*, 596 F.3d at 952.

If the Eighth Circuit intended to require a party to file its answers before anything it said, did, or filed could be construed as a motion under Rule 36(b) to withdraw its admissions, it would not have cited with approval the Tenth Circuit's *Bergemann* opinion, in which the defendant never served, much less filed, answers to the potentially dispositive requests for admission. *See Quasius*, 596 F.3d at 952.

There is no question the most appropriate and efficien—and least risky—course of action here would have been for Johnson to move formally to withdraw her admissions—*i.e.*, via a separate motion, designated specifically as such, that could have been the subject of distinct advocacy. *See id.* at 951. But given the numerous filings in which Johnson has specifically and consistently denied touching Hamilton and the thorough airing of this issue at the hearing on this motion, Johnson has done enough to file the "functional equivalent" of the motion required by Rule 36(b).[2]

Both of the Rule 36(b) factors favor permitting Johnson to withdraw her admissions to Courtois's requests for admission. Allowing Johnson to withdraw her admissions would enable her to prosecute her claims and contest Courtois's defenses on their merits. And given the timing of the withdrawal in the larger context of discovery, allowing withdrawal does not prejudice Courtois. Johnson served her responses denying each of the requests on April 27, 2018. Sautter Decl. Ex. 6 at 6–7. Discovery did not close until more than four

---

[2]     After the hearing, Johnson filed a "Motion To File Motion Out Of Time" in which she sought the Court's permission to file a formal Rule 36(b) motion after the deadline. ECF No. 30. In light of the conclusion that Johnson's previous filings constituted a motion to withdraw, the Court will deny Johnson's "Motion To File Motion Out Of Time" as moot.

months later, on September 7, 2018.  *See* Pretrial Scheduling Order at 1 [ECF No. 7].  In the intervening months, Courtois deposed Johnson, both officers, and two additional fact witnesses, and during those depositions Courtois had the opportunity to question each witness about the events addressed in the requests for admission, including Johnson's denials.  *See generally* Sauter Decl. Exs. 1–5.  Because both factors favor allowing Johnson to withdraw her admissions, the Court will treat Johnson's admissions as withdrawn for the purpose of resolving Courtois's summary-judgment motion.[3]

B

Courtois argues that he is entitled to qualified immunity as to both Johnson's false-arrest claim and her excessive-force claim.  In determining whether Courtois has qualified immunity, the Court asks: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct."  *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009).  Courts, in their sound discretion, may consider the questions in either order, but a § 1983 plaintiff can defeat a claim of qualified immunity only if the answer to both questions is yes.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

---

[3]      Contrary to at least the implication of some of Johnson's assertions at the hearing, the thirty-day deadline governing requests for admission matters—a lot.  Johnson's assertion to the effect that parties responding to requests for admission are routinely late, and by several months, seems dubious, or at least one can hope it is.  At the hearing, Johnson also seemed to characterize Courtois's position regarding the untimely answers as a "gotcha."  Not so.  Just as happened here, untimely responses to requests for admission obviously invite dispositive risk and, at the very least, cause added expense and time-consuming litigation over matters of procedure that distract from the merits.  That's not Courtois's fault.  His position on this issue was very reasonable.

"The Fourth Amendment right of citizens not to be arrested without probable cause is indeed clearly established." *Kuehl v. Burtis*, 173 F.3d 646, 649 (8th Cir. 1999). "[A]n officer is entitled to qualified immunity if there is at least 'arguable probable cause'" for a warrantless arrest. *Borgman v. Kedley*, 646 F.3d 518, 522–23 (8th Cir. 2011) (quoting *Walker v. City of Pine Bluff*, 414 F.3d 989, 992 (8th Cir. 2005)). "Probable cause to make a warrantless arrest exists 'when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense.'" *Ulrich v. Pope Cty.*, 715 F.3d 1054, 1059 (8th Cir. 2013) (quoting *Borgman*, 646 F.3d at 523). If an officer makes a warrantless arrest under the mistaken belief that probable cause for the arrest exists, that officer is shielded by qualified immunity "if the mistake is 'objectively reasonable.'" *Borgman*, 646 F.3d at 523 (quoting *Amrine v. Brooks*, 522 F.3d 823, 832 (8th Cir. 2008)).

Furthermore, under the collective-knowledge doctrine, the knowledge of one law-enforcement officer may be imputed to others for Fourth Amendment purposes where the officers "work together on an investigation" and "some degree of communication exists between them." *United States v. Gillette*, 245 F.3d 1032, 1034 (8th Cir. 2001) (citations and internal quotation marks omitted). The Eighth Circuit has applied the collective-knowledge doctrine broadly, even including to those situations where there has been no communication among officers with respect to the particular information that would provide the factual basis for the particular search or seizure at issue, and no

instruction issued by an officer in possession of such facts to another who acts in reliance on that imputed knowledge.  *See id.* at 1033.

Courtois arrested Johnson for obstructing legal process under Minn. Stat. § 609.50. He now argues that he had at least arguable probable cause to arrest her for violating subdivision 1, subparts (1) and (2) of that statute.[4]  As relevant here, those subparts make it a crime to "obstruct[], hinder[], or prevent[] the . . . apprehension of another on a charge or conviction of a criminal offense," or to "obstruct[], resist[], or interfere[] with a peace officer while the officer is engaged in the performance of official duties."[5]  Minn. Stat. § 609.50, subd. 1(1)–(2).  A little more than thirty years ago, the Minnesota Supreme Court summarized the obstruction statute as follows:

> [T]he statute forbids intentional physical obstruction or interference with a police officer in the performance of his official duties.  The statute may be used to punish "fighting words" or any other words that by themselves have the effect of physically obstructing or interfering with a police officer in the performance of his duties—*e.g.*, the statute may be used to punish a person who runs beside an officer pursuing a felon in a public street shouting and cursing at the officer if the shouting and cursing physically obstructs the officer's pursuit and if the person intends by his conduct to obstruct or interfere with the officer. However, the statute does not apply to ordinary verbal criticism directed at a police officer even while the officer is performing his official duties . . . .

---

[4]     Courtois's brief addressed the question of probable cause under both subparts (1) and (2) of subdivision 1, *see* Defs. Mem. in Supp. at 19–20, though the only subpart referenced in Johnson's arrest paperwork is subpart (1), *see* Sautter Decl. Ex. 8 at 1–3, 5–6 [ECF No. 20–8].  The Court addresses both subparts here to the extent Courtois intended to argue that he possessed probable cause to arrest Johnson for an offense other than the one for which she was actually arrested.

[5]     The version in effect today is the same as was in effect when Johnson was arrested.

*State v. Krawsky*, 426 N.W.2d 875, 877–78 (Minn. 1988) (citation omitted); *see also* Defs. Mem. in Supp. at 20 [ECF No. 19] (citing and quoting *Krawsky*). The Minnesota Supreme Court observed also that the obstruction statute does not punish "interrupting" an officer, even intentionally. *Id.*; *see also State v. Tomlin*, 622 N.W.2d 546, 548 (Minn. 2001) (recognizing that § 609.50 is "directed solely at a particular kind of physical act that physically obstructs or interferes with an officer" or "in limited circumstances . . . 'fighting words' [that] have the effect of physically obstructing or interfering with an officer").

Here, Courtois's qualified-immunity argument is based largely on the factual premise that Johnson touched Hamilton, thereby physically interfering with Hamilton's arrest of Duncan and providing probable cause to arrest her for obstruction. *See generally* Defs. Mem. in Supp. at 21–22. But as described above, Johnson's admission to that effect will be ordered withdrawn. In her deposition, Johnson repeatedly testified that she never touched Hamilton as he arrested Duncan. Johnson Dep. at 44–45. Johnson's sister testified the same. E. Johnson Dep. at 36. A genuine issue of material fact therefore exists as to whether Courtois could have possessed arguable probable cause under the collective-knowledge doctrine to arrest Johnson on the basis of any physical contact she might have had with Hamilton.

Courtois also argues that, even if a factual dispute exists as to whether Johnson touched Hamilton, probable cause—or at least arguable probable cause—nevertheless existed to arrest her based on her physical proximity to Hamilton and her failure to move away when instructed to do so. Defs. Mem. in Supp. at 22–24. The parties and witnesses dispute how close Johnson came to Hamilton and whether she moved away when instructed

to do so. Courtois asserts that he reasonably believed Johnson was so close to Hamilton that she physically obstructed Hamilton's arrest of Duncan solely by virtue of her proximity. Courtois also asserts that he reasonably believed that Johnson did not comply with instructions to move away from the scene of the arrest. Johnson asserts that fact disputes exist with respect to both issues and that those fact disputes preclude the entry of summary judgment in favor of Courtois.

Regarding proximity, Courtois argues in his brief that he thought Johnson was "right up against Hamilton, perhaps a foot away." Defs. Mem. in Supp. at 22; *see also id.* at 24 ("Courtois thought she was a foot or two feet away."). Courtois was more equivocal in his deposition. He testified first that she was "[w]ithin a few feet" of Hamilton, Courtois Dep. at 22, which is arguably consistent with Johnson's testimony that initially she was three or four feet away. He also said it could have been two and a half feet, or as little as one foot, but definitely less than six feet. *Id.* at 22–23. Not only does this testimony present a fact issue of how far Johnson was from Hamilton, it presents a fact issue of how far Courtois *thought* she was from Hamilton. Courtois asserts in his opening brief, without citation to the record, that "Courtois'[s] mistake of distance is reasonable under the quickly developing, and moving circumstances outlined in this case." Defs. Mem. in Supp. at 24. Similarly, in his reply brief, Courtois argues:

> Even assuming Courtois was wrong about his distance estimate, or the level at which [Johnson] was interfering with Hamilton, his alleged mistake is not sufficient to defeat the arguable probable cause standard of qualified immunity because such mistakes are reasonable given the vagaries of a nighttime arrest in an active bar district, when sightlines may be blocked.

Defs. Reply Mem. at 13.   Again, no record citations support these assertions, including particularly the assertion that Courtois's sightlines were or may have been blocked.   As the party asserting immunity, Courtois has the burden of establishing the relevant predicate facts.   *White v. McKinley*, 519 F.3d 806, 813 (8th Cir. 2008).   On the facts presented, Courtois has not carried his burden to show that any mistake he made as to distance was reasonable under the circumstances, and the Court cannot assume that it was.   (From the deposition excerpts filed with the Court, it appears that at least two witnesses were asked to mark the location of various events that evening on a map as a deposition exhibit, *see, e.g.*, Johnson Dep. at 40; Hamilton Dep. at 17–18, but no such exhibit has been filed in connection with this motion, and thus the Court has no basis on which to consider how close Johnson might have seemed from Courtois's perspective, aside from the witnesses' conflicting testimony.)

Under Johnson's version of events, she was standing three or four feet from Hamilton as he arrested Duncan.   Johnson Dep. at 78.   Using a calm but urgent voice—not angry or yelling—she asked Hamilton why he was arresting her friend.   *Id.* at 44–45; E. Johnson Dep. at 36.   Hamilton ignored her, so she asked again. Johnson Dep. at 44–45. Courtois does not argue that, if Johnson was standing three or four feet away, calmly but urgently asking Hamilton why he was arresting her friend, and receiving no acknowledgement in return, that her actions could constitute arguable probable cause for an obstruction arrest.   That makes sense.   One reasonably may question the wisdom of approaching and standing three or four feet away from an officer engaged in an arrest in

many circumstances. But accepting Johnson's version of the facts as true under the circumstances of this case, her proximity to Hamilton alone would not have resulted in "physical" obstruction prohibited by Minn. Stat. § 609.50 and would not have given Courtois arguable probable cause to believe it did. Neither does Courtois argue that Johnson's speech (asking Hamilton why he was arresting her friend) resulted in obstruction.

Regarding whether Johnson refused an order to leave the scene, Courtois and Hamilton testified that Johnson was ordered to move away but failed to comply. *E.g.*, Hamilton Dep. at 21; Courtois Dep. at 20–21. Johnson's testimony regarding whether she was told to move away is vague. When first asked whether Courtois told her "to walk away and leave them alone," Johnson testified unequivocally, "No." Johnson Dep. at 49. When asked in the very next question if Courtois told her to "leave," Johnson testified that Courtois "might have said something along those lines." *Id.* Perhaps Johnson understood an order to "walk away and leave them alone" to mean something different from "something along the lines of" an order to "leave," but that would seem odd. Regardless, Johnson's testimony creates a fact issue. If Johnson's testimony is that she was never told to move away, then her failure to comply with an instruction she was never given could not have created arguable probable cause for Courtois to arrest her. If Johnson's testimony is that she had been told to move away, then according to Johnson's deposition testimony and her sister's cell-phone video, she complied. Johnson testified that she was already backing up when she declared "I have every right to be here," and the video recording of the incident reasonably may be understood to support Johnson's testimony. Sautter Decl. Ex. 10;

Johnson Dep. at 49–50. If a fact-finder were to reach that reasonable conclusion—*i.e.*, that Johnson was moving back as ordered—then Courtois would not have had reasonable probable cause to arrest Johnson for failing to move away.[6]

2

"To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the particular circumstances." *City of Golden Valley*, 574 F.3d at 496 (citations and internal quotation marks omitted). Under that standard, the Court must evaluate all of the facts and circumstances surrounding the use of force, "careful[ly] balancing . . . the nature and quality of the intrusion on [Johnson's] Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citation and internal quotation marks omitted). "Once the predicate facts are established, the reasonableness of [Courtois's] conduct under the circumstances is a question of law." *Howard v. Kansas City Police Dep't*, 570 F.3d 984, 989 (8th Cir. 2009).

In evaluating the reasonableness of an officer's use of force in the context of an arrest, courts consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether [the suspect] is actively

---

[6]     The absence of undisputed evidence showing, for example, an unruly crowd, repeated interference in Hamilton's work, or noncompliance with the officers' orders distinguishes this case from other obstruction-based § 1983 cases entering summary judgment on the basis of qualified immunity. *See, e.g.*, *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1009–10 (8th Cir. 2017); *Spoo v. Maciejewski*, No. 02-cv-4255 (JMR/FLN), 2004 WL 2457859, at *4–5 (D. Minn. Oct. 14, 2004).

resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)). Furthermore, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97; *see City of Golden Valley*, 574 F.3d at 496.

An individual's right to be free from a particular use of force is clearly established for purposes of the qualified-immunity analysis if "a reasonable officer would have fair warning that his alleged conduct was unlawful." *City of Golden Valley*, 574 F.3d at 499. This inquiry is distinct from the question of whether a particular use of force was objectively reasonable in that "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine whether it was clearly established." *Craighead v. Lee*, 399 F.3d 954, 962 (8th Cir. 2005). "A right is clearly established if its contours are 'sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful.'" *City of Golden Valley*, 574 F.3d at 499 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). A prior controlling authority presenting "materially or fundamentally similar facts" need not have explicitly affirmed the existence of a right for the right to be considered clearly established. *Brown v. Fortner*, 518 F.3d 552, 561 (8th Cir. 2008)

(citation and internal quotation marks omitted). "The relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2009). That inquiry presents a legal question for the court to decide. *Kahle v. Leonard*, 477 F.3d 544, 549 (8th Cir. 2007). Accordingly, the Court must determine here whether the evidence most favorable to Johnson "support[s] a claim of violation of [her] clearly established right such that a reasonable officer would have fair warning that his alleged conduct was unlawful." *City of Golden Valley*, 574 F.3d at 499.

Courtois argues that his use of force against Johnson was objectively reasonable under two different theories—one, if his use of force is considered as part of her arrest, and the other, even if the arrest itself was not legitimate and instead the Court considers his use of force merely as an attempt to control the scene. But fact disputes preclude a finding of qualified immunity as to either theory.

Courtois argues, first, that his use of force against Johnson was reasonable in the context of effecting Johnson's arrest. *See generally* Defs. Mem. in Supp. at 12–16. But such an argument can succeed only if the arrest itself was legal. If Courtois lacked probable cause—or arguable probable cause—to arrest Johnson, then the force he used to effect that arrest was excessive. *See Trang Nguyen v. Lokke*, No. 11-cv-3225 (PJS/SER), 2013 WL 4747459, at *3–4 (D. Minn. Sept. 4, 2013); *cf. Graham*, 490 U.S. at 396 ("[T]he right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."). As *Trang Nguyen* explained:

It has long been clearly established that a seizure without probable cause is unreasonable under the Fourth Amendment (except under narrow circumstances recognized in such cases as *Terry v. Ohio*, 392 U.S. 1 (1968)). It follows then, that a reasonable officer would know that, in a situation in which any seizure is unreasonable, the use of any force to effect a seizure would likewise be unreasonable.

*Id.* at *4 (citation omitted). The case on which Courtois relies for the proposition that his use of force was objectively reasonable in the context of Johnson's arrest, *Crumley v. City of St. Paul*, 324 F.3d 1003 (8th Cir. 2003), is distinguishable based on the existence of arguable probable cause. *See id.* at 1005. In *Crumley*, the Eighth Circuit assessed the reasonableness of the police officer's use of force in the context of a lawful arrest; the § 1983 plaintiff had been collaterally estopped from arguing that she had been arrested without probable cause. *Id.* at 1006. Here, for the same reasons that fact issues preclude summary judgment on Johnson's false-arrest claim, they also preclude summary judgment on her excessive-force claim insofar as Courtois argues that his use of force was justified to arrest her.

Alternatively, Courtois argues that it was objectively reasonable for him to shove Johnson "to encourage compliance with" his order to "back off and leave"—or at least that it was not clearly established that he could not shove her to "encourage [her] compliance." Defs. Reply Mem. at 8. As counsel characterized it at the hearing, the shove was merely a reasonable form of crowd control—in this case, a crowd of one. The merits of this alternative theory of qualified immunity are difficult to assess because Courtois's opening brief, and thus Johnson's response, focus exclusively on Courtois's use of force within the arrest context. Only in half a sentence of Courtois's reply does he suggest that the shove

should be analyzed in the context of a law enforcement officer's crowd-control efforts, and he cites no authority and scant facts relating to how such a theory of qualified immunity applies under the circumstances of this case. On that basis alone, it would be inappropriate to construct a best guess at the facts the parties might cite for and against the argument that Courtois's shove[7] constituted a reasonable crowd-control measure, completely independent of any role it might have played in Johnson's arrest. *Cf. McKinley*, 519 F.3d at 813 (holding that the party asserting immunity has the burden of establishing the relevant predicate facts). But Courtois did assert that qualified-immunity theory more directly at the hearing, and to aid in the efficient management of this case as it proceeds toward trial, the argument will be addressed as thoroughly as possible given the lack of meaningful briefing on the issue.

Courtois argues it was objectively reasonable for him to shove Johnson to "encourage" her to move back. The Eighth Circuit has previously used the factors identified in *Graham* to assess whether a law enforcement officer's use of force was objectively reasonable when deployed against someone who could not reasonably have been considered a suspect at the time. *E.g.*, *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1209–10 (8th Cir. 2013). If the facts are as Johnson says they are, then under the *Graham* factors Courtois's use of force was objectively unreasonable. As discussed at

---

[7] The Court notes that Courtois argues that his shove was "measured and reasonable," Defs. Mem. in Supp. at 12, but not that his use of force was *de minimis*, *see Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011) (holding that although *de minimis injury* does not necessarily foreclose an excessive-force claim under the Fourth Amendment, a *de minimis use of force* does).

length above, a fact dispute exists as to whether Johnson had committed any obstruction offense or disobeyed any lawful order from police. A reasonably jury could find that Johnson was *not* resisting an order—either because (as Johnson contends, and thus as the Court must accept for purposes of this motion) she had not been ordered to back up, or because (as Courtois contends) she had been ordered to back up—which, as the video depicts, she began doing well prior to being shoved. Courtois has not argued that, after Johnson had backed up to the spot where the two paused and he shoved her, her location or behavior posed an immediate threat to his safety or anyone else's. She was not actively evading arrest or attempting to flee. In Johnson's account, she became verbally aggressive only in response to being shoved, so her subsequent verbal aggression towards Courtois can play no role in assessing whether the shove itself was objectively reasonable. If the fact-finder were to conclude (as it reasonably might) that Johnson had committed no crime, posed no immediate threat to law enforcement officers or to others, and was neither refusing the lawful order of a peace officer nor fleeing the scene, then it was objectively unreasonable for Courtois to use force against her without first giving her "the opportunity to comply with a legitimate request by a law enforcement official" to back up further still. *Atkinson*, 709 F.3d at 1210.

This case is distinguishable from *Mraz v. Drogseth*, No. 13-cv-2744 (DSD/HB), 2015 WL 224713 (D. Minn. Jan. 15, 2015), cited by Courtois, in which both the § 1983 plaintiff and the officer she accused of using excessive force agreed—and footage from the officer's dashboard camera confirmed—that, prior to the officer's use of force, he had ordered the plaintiff multiple times to step out of her vehicle as he was investigating a 911

call. *Id.* at *1. If similar circumstances undisputedly existed here, then as in *Mraz*, the Court could conclude that it was objectively reasonable for Courtois to shove Johnson to "encourage" her to back up. But if Johnson testifies that she was not instructed to leave and a jury agrees with her, or if it finds based on the recorded video that, upon being ordered to leave she promptly complied and moved several feet backwards, then it was not objectively reasonable for Courtois to shove her to "encourage" her to do what she had already done.

Under the two-step qualified-immunity inquiry, the next question is whether Johnson's right to be free of the force Courtois used to "encourage" her to back up was clearly established at the time of the incident. It was. The Eighth Circuit has held that, where none of the three *Graham* factors suggest that an officer's use of force was reasonable, the use of such force violates clearly established Fourth Amendment rights. *See Atkinson*, 709 F.3d at 1212–13 ("But had [the defendant officer] perused the United States Reports on [the date of the incident at issue], he would have discovered the Supreme Court's 1989 decision in *Graham*, showing his extreme use of force against [the § 1983 plaintiff] was unconstitutional."). Of particular concern to the Eighth Circuit's analysis in *Atkinson* was the plaintiff's evidence that he was not resisting arrest. *Id.* (collecting cases); *cf. id.* at 1210 (finding use of force was not objectively reasonable where officer "never gave Atkinson the opportunity to comply with a legitimate request by a law enforcement official"). As recently as two months ago, the Eighth Circuit reaffirmed that principle, holding that a reasonable officer would understand that, if a nonviolent, nonthreatening misdemeanant was not resisting arrest but simply "did not have time to comply" with an

officer's order, the use of a "significant force" against her would violate her clearly established right under the Fourth Amendment to be free of excessive force. *Karels v. Storz*, 906 F.3d 740, 746–47 (8th Cir. 2018) (emphasizing the § 1983 plaintiff's lack of resistance and explaining that "there is no requirement that the plaintiff must find a case where the very action in question has previously been held unlawful, so long as existing precedent has placed the statutory or constitutional question beyond debate" (citations and internal quotation marks omitted)).

The conclusion that Johnson has made out the violation of a clearly established right is further informed by the Eighth Circuit's decision in *Guite v. Wright*, 147 F.3d 747 (8th Cir. 1999). That decision upheld the denial of summary judgment based on qualified immunity where the § 1983 plaintiff had told officers, who were standing at the front door of his home asking to see his son, whom they suspected in a series of robberies, to either present a warrant or leave his property. *Id.* at 749–50. One officer responded that they did not need a warrant, and the second grabbed his wrist, pushed him backwards, and held him against the open door. *Id.* at 749. In other words, the *Guite* plaintiff—like Johnson— alleged that he had acted utterly lawfully prior to the officer's decision to use a roughly comparable amount of force to that alleged here. Under those circumstances, the Eighth Circuit found that the officer who grabbed Guite and held him against the door had violated Guite's clearly established Fourth Amendment right to be free from excessive force. *Id.* at 750.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

**IT IS HEREBY ORDERED** that:

1.    Defendants' summary-judgment motion [ECF No. 17] is **GRANTED IN PART AND DENIED IN PART** as follows:

      a.    The motion for summary judgment as to all claims against Defendants City of Minneapolis and Officer Ephrem Hamilton is **GRANTED**;

      b.    The motion for summary judgment as to Counts 3 and 4, alleging state tort claims, is **GRANTED**; and

      c.    The motion for summary judgment as to Counts 1 and 2 is **GRANTED** insofar as those counts allege claims under the Minnesota Constitution and **DENIED** in all other respects; and

2.    Plaintiff's Motion To File Motion Out Of Time [ECF No. 30] is **DENIED AS MOOT**.

Dated:  December 21, 2018         s/ Eric C. Tostrud
                             Eric C. Tostrud
                             United States District Court